IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  10-cv-01765-WYD

PHILLIP D. BAROS, JR.,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

---

**ORDER**

---

THIS MATTER is before the Court on review of the Commissioner's decision that denied Plaintiff's claim for supplemental security income ["SSI"].  For the reasons stated below, this case is reversed and remanded for further fact finding.

I.    <u>INTRODUCTION AND BACKGROUND</u>

Plaintiff was born on August 27, 1966.  (Transcript ["Tr."] 17.)  At the time of the ALJ's decision in September 2008, Plaintiff was 42 years old, defined as a younger individual.  (*Id.*)  Plaintiff has a limited education (*id.*), and worked in the 1990's as an onion grader and appliance deliverer for Goodwill.  (*Id.* 22, 25, 138.)  He lives with his mother and father.  (*Id.* 23.)

On April 18, 2006, Plaintiff protectively filed an application for SSI under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383 ["the Act"].  (Tr. 101-03.)  Plaintiff alleged that he became disabled on January 1, 2002 due to "[a]rthritis, forgetfulness,

sleep apnea, anxiety, hypertension, bronchitis, and back and foot pain". (*Id*. 137).[1]

The Colorado Disability Determination Services denied Plaintiff's claim at the initial

determination stage. (*Id*. 50, 52-54). An administrative law judge ["ALJ"] held a hearing

on May 13, 2008. (*Id*. 19-33). On September 23, 2008, the ALJ issued a decision

finding that Plaintiff was not disabled under the Act because he could perform work that

exists in significant numbers in the national economy. (*Id*. 6-18.)

More specifically, the ALJ found at step one that Plaintiff had not engaged in

substantial gainful activity since April 18, 2006, the date of the application. (Tr. 11.) At

step two, the ALJ determined that Plaintiff's mild degenerative changes of the lumbar

spine, a disorder of the bilateral ankles, untreated hypertension, untreated shortness of

breath/syncope of unknown etiology, and a history of alcohol and polysubstance

dependence were "severe" impairments. (*Id*.)

The ALJ found at step three that Plaintiff did not meet or equal a listed

impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 13, Finding 3). She rejected

counsel's argument that Plaintiff's intellectual functioning meets Listing 12.05 for Mental

Retardation, finding that the record did not contain a valid verbal, performance, or full-

scale IQ score of 59 or less as required to meet that Listing. (*Id*. 13, 15-16.)

The ALJ then determined that Plaintiff retained the residual functional capacity

["RFC"] to perform light work that does not require exposure to unprotected heights or

dangerous machinery or the performance of complex tasks (SVP of 3 or less). (Tr. 13,

---

[1] The instant appeal relates to Plaintiff's third application for SSI benefits. (Tr. 27.) Plaintiff was not represented by counsel on the prior applications, and no hearing was conducted on the prior unfavorable rulings. (*Id*.)

Finding 4.)  She found Plaintiff's statements regarding his symptoms not to be credible to the extent they were inconsistent with the RFC finding.  (*Id.* 14).

At step four, the ALJ found that Plaintiff has no past relevant work as he has not performed substantial gainful activity in the past fifteen years.  (Tr. 16, Finding 5.)  After considering the entire record, the ALJ found at step five that Plaintiff's RFC did not preclude his ability to perform work that exists in significant numbers in the national economy.  (*Id.* 17, Finding 9.)  As a result, she found that Plaintiff was not disabled under the Act.  (*Id.* 18, Finding 10).

The Appeals Council declined the request for review on June 4, 2010.  (Tr. 1-4.) In so doing, it considered Plaintiff's arguments and the additional evidence listed in its Order and found that the information "does not provide a basis for changing" the ALJ's decision.  (*Id.* 1-2, 5.)  The additional information it reviewed included special education records from Plaintiff's high school.  (*Id.* 5.)  That was the final administrative decision.

Plaintiff argues that the ALJ erred in rejecting the opinions of examining doctors and state officials in finding that he does not meet the mental retardation listing. Further, he argues that the ALJ erred in evaluating the evidence at steps two and three and in determining his RFC.  Finally, he argues that the ALJ erred in failing to supplement the record and reopen the earlier unfavorable SSI decisions.

II.    ANALYSIS

A.    Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether

the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988).

"Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

      B.      <u>Whether the ALJ's Decision is Supported by Substantial Evidence</u>

            1.      <u>Whether the ALJ Erred at Steps Two and Three in Regard to Plaintiff's Mental Impairments</u>

Plaintiff first argues that the ALJ erred at steps two and three in regard to Plaintiff's mental impairments as she failed to follow correct legal procedures in evaluating the evidence. In that regard, Plaintiff argues that the ALJ substantially failed to evaluate his mental impairment as required by 20 C.F.R. §§ 404.1520a and 416.920a. In finding that Plaintiff does not meet the Listing for Mental Retardation, the ALJ had to reject opinion evidence concerning Plaintiff's intellectual functioning provided by three sources: the opinions of Drs. Morton and Campbell and the IQ test results derived from Plaintiff's special education records. Plaintiff asserts that the ALJ erred in

her consideration and rejection of relevant opinion evidence from each of these sources. Plaintiff also argues that the ALJ erred in determining whether the combination of his impairments meets or equals a listing and in determining his RFC.

Turning to my analysis, at step two the ALJ stated she found "no reason to discount Dr. Berkowitz's opinion" that Plaintiff has no severe medically determinable mental impairment. (Tr. 12.) She also found based on the opinions of Drs. Johnston and Berkowitz that neither anxiety nor forgetfulness was established as a medically determinable impairment. (*Id.*) Dr. Berkowitz completed a Psychiatric Review Technique Form ["PRTF"] in August 2006 finding that Plaintiff's mental impairments, including antisocial personality and history of drug abuse, were not severe. (*Id.* 198-211.) He assigned Plaintiff a GAF score of 85[2], and assessed no functional limitations based on the consultative examination of Dr. Johnston. (*Id.* 210, *see also* 191-93-report of Dr. Johnston dated August 8, 2006.)

I first address whether the ALJ followed the correct procedure in evaluating Plaintiff's mental impairments. "Under the regulations, when evaluating mental impairments, the agency must follow a 'special technique.'" *Stokes v. Astrue*, No. 07-5046, 2008 WL 1766788, at *2 (10th Cir. 2008) (unpublished). "Under this technique, the agency is required to rate the degree of a claimant's functional limitations caused by those impairments in the areas of '[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.'" *Id.* (quoting 20

---

[2] "The GAF is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Langley v. Barnhart*, 373 F.3d 1116, 1122 n. 3 (10th Cir. 2004).

C.F.R. §§ 404.1520a(d)(1-2), 416.920a(d)(1-2)). "The ALJ then applies those ratings in determining whether the claimant's mental impairments are severe at step two and, if so, whether these severe impairments 'meet[] or [are] equivalent in severity to a listed mental disorder' at step three." *Id.* (quotation omitted). The ALJ appeared to have complied with this analysis as to those mental impairments that were addressed in the PRTF prepared by Dr. Berkowitz that was adopted by the ALJ.

Plaintiff argues, however, that the PRTF was completed in August 2006, more than a year before the evidence was submitted supporting Plaintiff's claim that he meets the requirements of Listing 12.05 for Mental Retardation. He further points out that the PRTF does not include any review or consideration of mental retardation. I agree with Plaintiff that the ALJ erred at step two in not adequately considering the mental impairment disclosed in the additional medical records; namely, mental retardation. This impairment was not considered in the PRTF prepared by Dr. Berkowitz, and the ALJ did not consider or discuss at step two whether this impairment was severe, either individually or in combination with the other impairments. *See Salazar v. Barnhart*, 468 F.3d 615, 622 (10th Cir. 2006) ("It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. . . .The ALJ's failure to consider Ms. Salazar's borderline personality disorder, singly and in combination with her other impairments, requires that we reverse.").

The ALJ contends, however, that this error was harmless because Plaintiff's intellectual functioning was considered in subsequent steps. Specifically, the ALJ found

that Plaintiff did not meet the Listing for Mental Retardation at step three.  (Tr. 13.)  She further found in the RFC that Plaintiff was precluded from the performance of complex tasks (SVP of 3 or less).  Even if I assume the error to be harmless for purposes of this motion, I still find that this case must be reversed and remanded as the ALJ also erred at step three and in connection with the RFC, as discussed below.

Plaintiff argues that the ALJ abused her discretion at step three in rejecting Dr. Morton's medical opinion that was submitted by Plaintiff's counsel and in failing, once this new evidence was received, to request an updated medical judgment as to medical equivalence under SSR 96-6p.  That ruling requires that an updated medical opinion from a medical expert be obtained "[w]hen no additional medical evidence is received, but in the opinion of the [ALJ] or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or [w]hen additional medical evidence is received that in the opinion of the [ALJ] or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.  SSR 96-6p, 1996 WL 374180, at *3-4 (July 2, 1996).  Thus, "the ruling requires an updated medical opinion . . .if in the opinion of the ALJ or Appeals Council the additional medical evidence would change the finding on medical equivalence in the PRTF."  *Cannon v. Astrue*, No. 4:08-CV-160-D, 2010 WL 902485, at *11 (E.D.N.C. March 11, 2010) (unpublished).

In this case, it appears that neither the ALJ nor the Appeals Council was of the opinion that the additional medical evidence would change the finding in the PRTF that

Plaintiff's mental impairments were not severe. The issue then becomes whether this determination is supported by substantial evidence. *See Cannon*, 2010 WL 902485, at *11. The additional medical records disclose a mental impairment that was not considered in the PRTF prepared by Dr. Berkowitz; namely, mental retardation. This was significant new evidence regarding the mental health of Plaintiff that could have changed Dr. Berkowitz's opinion in the PRTF. Further, Dr. Morton's opinions regarding Plaintiff's cognitive weaknesses in many areas as well as his findings of mild to moderate impairments may impact Dr. Berkowitz's opinions regarding Plaintiff's ability to function in the four areas assessed in the PRTF. Accordingly, I find that the ALJ abused her discretion in failing to procure the assistance of a medical advisor to consider the severity of this impairment or in failing to remand the matter back to Dr. Berkowitz for consideration of these issues. *See Birnell v. Apfel*, 45 F. Supp. 2d 826, 837 (D. Kan. 1999).

I also find that the ALJ erred in giving no weight to the new evidence submitted by Plaintiff. The ALJ concluded that Plaintiff did not meet the Listing for Mental Retardation based entirely on Dr. Johnston's estimate of Plaintiff's IQ being "around 90, or at the low end of the average range of intellectual functioning." (Tr. 15.) She found that Dr. Johnston "supported his opinion with objective mental status examinations findings". (*Id.*) This included his statements that Plaintiff's "fund of general information was good", his "fund of topical information was very good", his "memory, attention and concentration, and math skills" were good, his "cognition was very good and his vocabulary was quite adequate". (*Id.*)

In finding that Plaintiff did not meet the Listing for Mental Retardation, the ALJ gave no weight to the more recent IQ testing performed by Dr. Morton, stating she was "not persuaded" that the testing "resulted in valid I.Q. scores." (Tr. 15.) Dr. Morton administered the Wechsler Adult Intelligence Scale - Third Edition to Plaintiff. (*Id.* 243.) He opined from this testing that Plaintiff "is functioning in the Mild Mentally Retarded range of mental abilities", with a Verbal Scale IQ of 63, Performance Scale IQ of 59, and Full Scale IQ of 58. (*Id.*)[3] He also found that Plaintiff "exhibits adaptive functioning deficits in use of community resources, self-direction, and functional academic skills, which warrants a diagnosis of Mental Retardation." (*Id.*)[4]

I find that the ALJ's decision to accept Dr. Johnston's assessment of Plaintiff's IQ is not supported by substantial evidence. The regulations make clear that an IQ score must be "valid" in order to be relied on. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.05B (requiring "[a] valid verbal, performance, or full scale IQ of 59 or less"). In order to be valid, standardized IQ testing must generally be performed. This is explained in 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00. That Listing states that "[s]tandardized intelligence test results are essential to the adjudication of all cases of mental

---

[3] "'In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Wechsler series'", the lowest of these scores is used in conjunction with 12.05. *Lax v. Astrue*, 489 F.3d 1089, 1085 (10th Cir. 2007) (quotation omitted).

[4] Further, he noted that the testing revealed a number of "considerable weaknesses" in regard to Plaintiff including, but not limited to, "word knowledge; numerical problem solving abilities, attention, and concentration; common sense, understanding, and practical judgment in the abstract; ability to distinguish essential from non-essential details; spatial abstract thinking abilities and visual-motor coordination; and logical reasoning abilities." (*Id.*)

retardation that are not covered under the provisions of 12.05A.  *Id.*, 12.00(D)(6)(b).[5]  It

further states, "[g]enerally, it is preferable to use IQ measures that are wide in scope

and include items that include both verbal and performance ability.  *Id.*, 12.00(D)(6)(d).

Listing 12.00 also states that the Social Security Administration ["SSA"] "may consider

exceptions to formal standardized psychological testing" only "when an individual

qualified by training and experience to perform such an evaluation is not available. . . ."

*Id.*, 12.00(D)(6)(e).  Again, that is not the situation here.

       The ALJ completely ignored the foregoing requirements, rejected the

standardized IQ testing that was in the record by Dr. Morton, and erred by relying

instead on Dr. Johnston's estimate.  Dr. Johnston did not perform IQ testing or even

opine whether the IQ score he estimated was valid and consistent with the

developmental history and the degree of functional limitation as required by the

regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(6)(a).  Reliance on this

estimate was thus error pursuant to Listing 12.00, even though Dr. Johnston may have

made certain findings which supported his estimate.  *See Cortes v. Comm'r of Soc.*

*Sec.*, 255 Fed. Appx. 646, 652 (3rd Cir. Nov. 27, 2007) (unpublished) (the fact that a

doctor "'never noted that the claimant had any difficulty comprehending instructions'" is

insufficient to discount the implication of Cortes's IQ score where the doctor did not treat

the claimant "for mental retardation and had no documents or tests from which to form a

judgment". . . . Also, the fact that a doctor noted that Cortes "'presented as intelligent'

_____

       [5]  Listing 12.05A may be the basis for adjudicating cases where the results of standardized
intelligence tests are unavailable, e.g., where the claimant's condition precludes formal standardized
testing."  *Id.*  That is not the situation here.

-10-

during his examination is not sufficient medical evidence to call into doubt the extensive evidence of sub-average general intellectual functioning'").  At the very least, the ALJ should have advised Dr. Johnston of Dr. Morton's findings and requested an updated opinion from him as to whether he believed his IQ scores were valid in light of Dr. Morton's IQ testing.  *See McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (requiring the ALJ to seek additional evidence or clarification from a medical source when his or her report "'does not contain all the necessary information'" or if the validity of the report is open to question) (quoting 20 C.F.R. § 404.1512(e)(1) (2001)).

I also find that the ALJ improperly rejected Dr. Morgan's opinion based on his testing on the basis of her own credibility judgments, speculation or lay opinion.  For example, the ALJ rejected Dr. Morton's opinion because she thought it "provides further examples of the inconsistency of the claimant's presentation" and because the Plaintiff's attorney requested it.  (Tr. 15.)  She stated in that regard:

> [A]t the consultative examination by Dr. Johnston, the claimant presented with a good fund of general knowledge and a very good knowledge of topical information.  Oddly, Dr. Morton found the claimant's fund of information to be poor.  The undersigned finds it inconceivable that the claimant's fund of knowledge could have diminished so significantly between the two examinations, the second of which was ordered by the clamant's attorney for the sole purpose of establishing disability due to mental deficiency.  Likewise, the claimant's memory was good in August 2006 but deficient in November 2007.  Without any intervening events to account for this change, the undersigned is convinced that, at the very least, the claimant did not put forth his best effort when undergoing examination and testing by Dr. Morton.

*(Id.* at 15-16.)

These are, however, improper lay judgments or speculation on the part of the ALJ which are not legitimate reasons to reject Dr. Morton's opinions.  An ALJ is not

entitled to reject a doctor's opinions without adequate justification or to substitute her own judgment for that of mental health professionals. *Winfrey v. Chater*, 92 F.3d 1017, 1021-22 (10th Cir. 1996); *see also McGoffin*, 288 F.3d at 1252 (an ALJ may reject a medical provider's opinion "outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation, or lay opinion").

Further, as to the finding that it was inconceivable that Plaintiff's fund of knowledge could have diminished so significantly between the two examinations, the ALJ ignored the fact that Dr. Morton supported his opinion that Plaintiff's general fund of knowledge is poor with specific examples.[6]  Further, Dr. Morton's opinion on this issue is a medical finding.  *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The ALJ errs in rejecting such an opinion in the absence of conflicting evidence.  *Id.*

Also, the ALJ's finding that Plaintiff did not put forth his best efforts is plainly incorrect and thus erroneous since it is directly contradicted by Dr. Morton's finding that Plaintiff "appeared to apply himself at an appropriate level and respond to the best of his ability."  (Tr. 243.)  Again, the ALJ improperly applied her own judgment over that of Dr. Morton.  At the very least, if the ALJ was concerned about the disparity between Dr. Morton's and Dr. Johnston's findings, she should have contacted Dr. Morton to inquire about this issue instead of simply outright rejecting his opinions.

---

[6]  He stated that Plaintiff could identity the present president but not the immediate past president. (Tr. 254.)  He could not identify Martin Luther King.  (*Id.*)  When asked what continent Brazil is Plaintiff stated "Germany".  (*Id.*)  When asked how many weeks are in a year Baros stated "336".  (*Id.*)  When asked the meaning of the word consume he stated "more".  (*Id.*).

I also find error with the ALJ's finding that Dr. Morton's testing was obtained by Plaintiff's attorney "for the sole purpose of establishing disability due to mental deficiency" (Tr. 15) as this does not appear to be accurate in light of the record. At the October 2007 hearing, the ALJ advised Plaintiff of his right to obtain a representative, have the representative see if anything is missing in the file, and assist in locating information for the record. (*Id.* 43-45.)

Counsel was retained shortly after the hearing (Tr. 72) and, after reviewing the record, obtained Plaintiff's special education records and forwarded them to the ALJ. (*Id.* 245). In his letter to the ALJ, counsel pointed out that the school's psychological report indicates that Plaintiff tested much lower on the IQ exam than the IQ of 90 estimated by Dr. Johnston. (*Id.*) Accordingly, counsel requested that the ALJ consider "obtaining a consultative IQ assessment in order to clear up the discrepancy in IQ scores." (*Id.* 245). When the ALJ set a hearing without requesting a consultative IQ examination, counsel contacted Dr. Morton and scheduled the evaluation. (*Id.* 241.) Thus, when faced with a failure on the part of the ALJ to respond to counsel's request for a consultative IQ examination or to develop the record as to that issue, counsel properly acted to obtain this consultation in order to establish disability. Indeed, it appears that he had a duty to do this to preserve the record on this issue. *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (the ALJ's duty to develop the record "does not permit a claimant, through counsel, to rest on the record . . . and later fault the ALJ for not performing a more exhaustive investigation").

The ALJ also improperly rejected the school testing done when Plaintiff was 15 years old. The ALJ rejected this testing because she found that the person who performed the test was a mental health worker and was thus not an acceptable source. (Tr. 15.) Further, she stated that the tester "noted that the claimant was less than cooperative with the testing, tending to just quit when the answers became the least bit difficult and, when pushed, to become sullen and just refuse to answer." (*Id.*)

Both the ALJ and Commissioner, who argues that the IQ testing at age 15 has expired, appear not to understand the role of this IQ testing. As noted by the Tenth Circuit, "[i]n order to satisfy listing 12.05, a claimant must 'meet[ ] the requirements of that listing's 'capsule definition ... [as well as] one of the four severity prongs for mental retardation as listing in the regulations.'" *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1085 (10th Cir. 2007)). "In order to meet the capsule definition, a claimant must present evidence demonstrating or supporting the existence of subaverage general intellectual functioning with deficits in adaptative functioning initially manifested before the age of 22." *Id.* Here, the testing by Plaintiff when he was 15 supports the existence of such issues during the developmental period. Thus, it should have been considered by the ALJ for that purpose, regardless of whether the person who conducted this test was an acceptable medical source.[7]

---

[7] Indeed, "the Commissioner has clarified that in order for a claimant to carry her burden with respect to the onset of mental retardation, it is unnecessary to" even produce intelligence testing prior to age 22. *Cortes*, 255 Fed. Appx. at 652-53 (citing Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746, 50772 (August 21, 2000)). All that is required is evidence that "demonstrates or supports onset of the impairment before age 22.'" *Id.* at 653 (quoting *id.*)

The Commissioner argues, however, that even though Plaintiff received the diagnosis of mental retardation by Dr. Morton in 2007, the record does not demonstrate the functional limitations necessary to meet the Listing definition. First, he asserts that there is very little evidence that Plaintiff met the capsule definition of Mental Retardation prior to age 22. This is not true, however, as Plaintiff submitted evidence on this issue that the ALJ improperly rejected without adequate consideration, as discussed above. The Commissioner also states that even after age 22, Dr. Berkowitz found that Plaintiff had no severe mental impairment and no "B" criteria limitations. Dr. Berkowitz did not, however, assess whether Plaintiff was mentally retarded or had impaired intellectual functioning. Finally, the Commissioner asserts that Dr. Morton admitted his diagnosis of mental retardation was based purely on Plaintiff's testing scores. This argument must also be rejected, as Dr. Morton found in addition to the testing scores that Plaintiff "exhibits adaptive functioning deficits in use of community resources, self-direction, and functional academic skills", which warrant the mental retardation diagnosis. (Tr. 243.)

In addition to the findings from his testing, Dr. Morton also opined that Plaintiff has Mild Mental Retardation on Axis II, Occupational and Economic Problems on Axis IV, and on Axis V a GAF score of 50. (Tr. 243.) This GAF score is indicative of "serious symptoms or serious impairment in social, occupational, or school functioning, such as inability to keep a job." *Pisciotta v. Astrue,* 500 F.3d 1074, 1076 n. 1 (10th Cir.2007). Dr. Morton further opined that Plaintiff has moderate mental limitations in regard to carrying out instructions and in using good judgment and responding appropriately to

changes in the work place as well as other mild limitations.  (Tr. 244.)  He concluded

from his assessment that Plaintiff's "prognosis is poor."  (*Id.*)

The ALJ appeared to reject these opinions of Dr. Morton in their entirety.  In so

doing, she did not appear to weigh his opinions or state what weight, if any, she gave to

the opinions.  This also was error.  Dr. Morgan's opinions as a consultative physician

were required to be considered and weighed using the factors set out in 20 C.F.R.

§ 416.927(d).  *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).  While the

Commissioner argues that the ALJ considered the appropriate factors, the ALJ's

decision does not support this.  (Tr. 15-16.)

In addition to the opinions of Dr. Morton regarding Plaintiff's overall condition, the

impairments he found in Plaintiff's mental functioning were all relevant to Plaintiff's

mental RFC and should have been considered both at steps two and three (individually

and in combination with Plaintiff's other impairments).  The Tenth Circuit has made clear

that the existence of a moderate impairment is not the same as no impairment at all.

*Haga v. Astrue,* 482 F.3d 1205, 1208 (10th Cir. 2007).  They must be adequately

assessed as they may impact the ability to perform work.  *See Bowers v. Astrue*,

No. 07-5114, 2008 WL 794853, at *3 (10th Cir. March 26, 2008) (unpublished); *see also*

*Hartje v. Astrue*, No. C09-5486KLS, 2010 WL 3220615 at *12 n. 6 (W.D. Wash. Aug.

13, 2010) (unpublished) (moderate difficulties in functioning are "'significant' in the

relevant sense that those difficulties have more than a *de minimus* impact on plaintiff's

ability to perform work-related activities, and thus constitute probative evidence of

potential disability"); *Pereira v. Comm'r of Social Sec.*, No. 2:08-CV-3897(WJM), 2009

WL 1298415, at *4 (D.N.J. May 8, 2009) (unpublished) (evidence of treatment for depression along with, *inter alia*, moderate limitations in claimant's ability to respond to changes in the work setting were "more than enough to satisfy step two's *de minimus* threshold").

The ALJ also should have considered the GAF score of 50 assessed by Dr. Morgan. The ALJ can not simply ignore this evidence, as the ALJ is "tasked with determining the level of [the claimant's] functioning within the six domains." *Simien v. Astrue*, No. 06-5153, 2007 WL 1847205, at *2 (10th Cir. June 28, 2007) (unpublished) (finding that the ALJ erred in ignoring the claimant's GAF scores that ranged from 30 to 50). A score of 50 demonstrates that a claimant's mental impairments are serious and likely to have some effect on his ability to work." *Groberg v. Astrue*, No., 2011 WL 538870, at *5 (10th Cir. Feb. 17, 2011) (unpublished) (quotation omitted). This must also be considered on remand.

The Commissioner argues, however, that even if the ALJ erred by disregarding the mental limitations found by Dr. Morton, any error was harmless because it would have no effect on the outcome of the case. Even considering those mental limitations, the vocational expert testified that jobs exist in the national economy that an individual with mental limitations could perform. This argument is without merit. The RFC precluded jobs that required the performance of complex tasks (SVP of 3 or less). However, if Plaintiff is mentally retarded or has significantly diminished intellectual capacity, he may not even be able to perform the simple work that the vocational expert found, as discussed previously. A vocational expert would have to opine on this issue.

I also find that the ALJ erred in failing to consider Dr. Campbell's opinions regarding Plaintiff's mental impairments and the fact that they substantiate Dr. Morgan's opinions. Dr. Campbell found that Plaintiff has a "[h]istory of psychological disorders and possible learning impairments", and found that "there may be some cognitive deficits which could be associated with the psychological conditions." (Tr. 196.) She also found that "the main neuropsychological impairments seem to be in the significant psychological disorders that include social avoidance, anxiety, inadequate anger and impulse control." (*Id.*)

The ALJ rejected Dr. Campbell's opinions for reasons that were not legitimate. The ALJ first found that "the evaluation of limitations due to such impairments would appear to exceed [Dr. Campbell's] expertise." However, this is not accurate. The fact that Dr. Campbell is not a mental health specialist does not render her incapable of diagnosing and treating common mental illnesses. She is both a family medicine specialist and an occupational medicine specialist. "According to the American Academy of Family Physicians, the 'diagnosis and treatment of mental illness in an individual and family context [is an] integral component[ ] of family medicine.'" *Payne v. Comm'r of Social Sec.*, 402 Fed. Appx. 109, 120 n. 4. (6th Cir. Nov. 18, 2010) (quotation omitted) (unpublished). Further, Plaintiff points out that doctors who are board certified in occupational and environmental medicine must be competent in ten core competencies, including neurology and psychiatry. (See Pl.'s Opening Brief at 11.)

The ALJ also rejected Dr. Campbell's mental health opinions because "there are no objective findings to establish such impairments with the exception of the I.Q.

-18-

testing", which the ALJ deemed to be invalid. (Tr. 16.) However, there were objective findings as set forth in the History and Current Condition section and the "General" section of the Physical Examination in Dr. Campbell's report. (*Id.* 194-95.) "A psychological opinion may rest either on observed signs and symptoms or on psychological tests." *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). A doctor's observations about a claimant's limitations from mental limitations constitute specific medical findings. *Id.* Further, Dr. Campbell's opinions were substantiated by Dr. Morton's opinions, not just his IQ testing, and his opinions and testing were improperly rejected by the ALJ, as discussed previously.

Since the ALJ did not properly consider the evidence supporting Plaintiff's claim that he met the Listing for Mental Retardation, including the opinions of Drs. Morton and Campbell regarding Plaintiff's mental impairments, this case must be reversed and remanded for proper consideration of these issues at both steps two and three of the sequential evaluation.

2.    Whether the ALJ Erred in Assessing Plaintiff's RFC

Since I find that the ALJ did not properly consider all of Plaintiff's mental impairments, including his claim of mental retardation or diminished intellectual capacity, the RFC must also be reassessed on remand. I also, however, find other errors with the ALJ's RFC analysis.

First, the ALJ found in the RFC that Plaintiff is precluded from work that requires performance of complex tasks (SVP of 3 or less). (Tr. 13.) Implicit in this finding is that Plaintiff *can* perform jobs with an SVP of 2 or less. The ALJ did not state what evidence

she relied on in making this finding and I cannot determine from the record how the ALJ made this assessment. This is error, as it is axiomatic that all of the ALJ's required findings must be supported by substantial evidence." *Haddock v. Apfel*, 196 F.3d 1084, 1088 (10th Cir. 1999). Indeed, SSR 96-8p directs that the RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.*, 1996 WL 374184, at *7 (July 2, 1996). This error also requires a remand. *See Moon v. Barnhart*, No. 04-7130, 2005 WL 3446576, at *2-3 (10th Cir. Dec. 16, 2005) (unpublished) (remanding the case where the ALJ never specified what evidence supported his RFC finding and the court was thus unable to determine whether the RFC was supported).

Further, as to the physical RFC, the ALJ found that Plaintiff can perform light work that does not require exposure to unprotected heights or dangerous machinery. (Tr. 13.) In so finding, the ALJ gave "little weight" to the opinions of Dr. Campbell regarding Plaintiff's physical capacity and no weight to the findings of the State agency Single Decision Maker ["SDM"]. Instead, the ALJ stated that the physical RFC she assessed "is supported by the lumbar spine and ankle x-rays, clinically correlated by the minimal objective clinical findings, and also by giving the claimant the maximum benefit of the doubt regarding his reported breathing difficulty/syncope and hypertension." (*Id.* 16.) I find that the ALJ's physical RFC finding is not supported by substantial evidence and that the ALJ erred in rejecting Dr. Campbell's opinions.

First, the ALJ's assessment that the lumbar spine and ankle x-rays show that Plaintiff can perform light work, without any medical corroboration of this fact, is an improper medical judgment of the ALJ. The x-ray technician did not opine what the results of the x-ray meant in terms of Plaintiff's ability to work, and interpreting the results of x-rays which show abnormal findings is a medical judgment. Dr. Campbell found much more significant restrictions from her review of the x-rays as well has her examination of the Plaintiff. Specifically, Dr. Campbell opined that Plaintiff could lift and/or carry up to 20 pounds occasionally; occasionally bend, stoop, squat or kneel; and stand and/or walk no more than four hours per day; with avoidance of walking on uneven terrain. These were "specific medical findings" which the ALJ erred in rejecting in the absence of conflicting medical evidence. *Washington*, 37 F.3d at 1439.

The ALJ stated, however, that Dr. Campbell's opinions were not supported by objective medical findings. This is erroneous. Among other things, Dr. Campbell noted the results of the lumbar spine x-rays which showed "Mild anterior compression with Schmorl's nodes at T11 and T12. Degenerative lower lumbar facet arthropathy, mild hypertrophic changes. Slight retro spondylolisthesis of L3 on L4, and mild anteriolisthesis of L5 on S1". (Tr. 196.) She also stated that tenderness was reported in the left malleoli, left more than right" as well as in the paravertebral muscles parallel to L3-5. (*Id.*) "Trace anterior tibial edema is noted bilaterally", and range of motion "of the ankles is reported as stiff and uncomfortable". (*Id.*) Dr. Campbell further noted findings of mechanical low back pain and mild extremities edema at the anterior tibia and ankles. (*Id.*) She found that the ankle conditions would limit standing and walking

to about 4 hours a day.  (*Id.*)  Finally, she found that Plaintiff's shortness of breath which could diagnostically "include chronic bronchitis, chronic asthma and CHF associated with chronic uncontrolled hypertension . . . would probably be limiting within the same range as the musculoskeletal conditions".  (*Id.*)

The ALJ ignored the above findings and made lay judgments based on a selective application of Dr. Campbell's report.  For example, the ALJ noted that Dr. Campbell had found "normal strength throughout," while ignoring all of the above findings.  (Tr. 16.)  The ALJ also found, without any support from the record, that Plaintiff's "syncope appears to have resolved with the subsequent implantation of a pacemaker."  (*Id.*)

The ALJ also failed to properly weigh Dr. Campbell's opinions and to assess the relevant factors under the regulations.  This includes the fact that Dr. Campbell had examined Plaintiff at least twice in the past concerning his functional limitations.  (Tr. 194.)  While the ALJ stated that she gave Dr. Campbell's opinions "little weight", it appears that she gave them no weight.  However, she did not make this clear for the record.  This was error.  *See Langley v. Barnhart*, 373 F.3d 1116, (10th Cir. 2004) (holding that an ALJ's findings must be "'sufficiently specific to make clear to any subsequent reviewers the weight [she] gave to the . . . medical opinion and the reason for that weight'") (quoting SSR 96-6p, 1996 WL 374188, at *4).

Further, the ALJ failed to properly consider the fact that Dr. Campbell's opinions were supported by the opinion of the State Agency SDM.  (Tr. 212-19.)  While the ALJ correctly stated that the SDM's opinion was not entitled to expert weight, it still should

have been considered since it was directly supportive of Dr. Campbell's opinion and there appears to be no evidence to the contrary in the record. *See Carpenter v. Astrue*, 537 F.3d 1264, 1270 (10th Cir. 2008) (holding that a doctor's opinion from an evaluation had to be considered "in light of the other record evidence as well as the factors set out in the regulations").

On remand, the ALJ must properly weigh the medical evidence and assess Plaintiff's RFC. In so doing, the ALJ must keep in mind that RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. *Haga*, 482 F.3d at 1208 (citing 20 C.F.R. § 416.945(c)). A "regular and continuing basis" means "'8 hours a day, for 5 days a week, or an equivalent work schedule,' . . . and to 'respond appropriately to supervision, coworkers, and customary work pressures in a routine work setting,'. . . ." *Id*. Thus, "'[a] finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that [s]he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job [s]he finds for a significant period of time.'" *Washington*, 37 F.3d at 1442 (emphasis in original) (quotation omitted).

Finally on the issue of RFC, I agree with Plaintiff that the ALJ erred in her assessment of Plaintiff's pain. The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms; . . . [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the

[RFC] assessment." (Tr. 14.)  The ALJ appears to rely for her conclusion on the fact that there are little to no objective findings to support the severity of pain and functional limitation alleged." (*Id.* 15.)  However, this is not true as discussed above with regard to Dr. Campbell.  She discussed a number of objective findings which supported her clinical assessment of pain.  The Tenth Circuit has made clear that while the court "may not second-guess an ALJ's credibility judgments, such judgment by themselves 'do not carry the day and override the medical opinion of a treating physician that is supported by the record.'"  *McGoffin*, 288 F.3d at 1252 (quotation omitted).  The ALJ improperly disregarded Dr. Campbell's findings, as discussed previously.

The ALJ also discusses the fact that Plaintiff told differing versions of where he last worked, how long he worked, and his history of alcohol and drug dependence.  (*Id.*)  Although certainly relevant to a general credibility assessment, such considerations are not particularly relevant to whether Plaintiff experience pains or other symptoms of the frequency, intensity or persistence he alleges.  This is particularly true given the fact that Dr. Campbell clinically confirmed the existence of pain as alleged by Plaintiff.

Finally, the ALJ infers that Plaintiff's lack of treatment for his physical conditions means that the conditions are not painful or severe enough to limit his capacity to do work related activities.  While she acknowledges Plaintiff's financial condition, she appears to conclude that the lack of treatment is a result of not having made the effort to secure treatment rather than not having the funds or the mental competence to seek treatment.  This was error, as the ALJ did not conduct a proper analysis of the issue. The Tenth Circuit has made clear that before relying on failure to pursue treatment as a

basis to find that claimant is not suffering from pain and/or is not disabled, "'the ALJ should consider (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse.'" *Fuller v. Astrue*, No. 10-2037-JWL, 2011 WL 209527, at *17 (10th Cir. Jan. 21, 2011) (unpublished) (citing *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993)). The ALJ should also assess whether the claimant lacked the financial ability to pursue treatment or medication, as this may constitute justifiable cause for failing to comply with prescribed treatment. *Lee v. Barnhart*, No. 03-7025, 2004 WL 2810224, at *4 (10th Cir. Dec. 8, 2004) (unpublished). On remand, the ALJ must properly consider these issues in assessing Plaintiff's credibility.

### 3. Reopening of the Earlier Unfavorable SSI Decisions

Finally, Plaintiff argues that the ALJ deprived him of due process in failing to supplement the record and reopen the earlier unfavorable SSI decisions. He asserts that after his counsel obtained the special education records and the results of the consultative examination by Dr. Morton, Plaintiff's counsel requested an on-the-record decision in Plaintiff's favor. (Tr. 85.) In that request, counsel explained he was unable to argue for an onset date earlier than April 27, 2006 because of lack of access to the earlier files and he was therefore unable to determine whether good cause existed for reopening any of the earlier claims. (*Id.*)

Later, at the hearing conducted on May 13, 2008, Plaintiff's counsel argued that good cause existed to reopen at least the March 8, 2004 denial based on Plaintiff's

mental impairment and lack of representation on the earlier claim.  (*Id.* 22.)  The ALJ denied this request.

20 C.F.R. § 416.1488(b) authorizes the reopening of a determination within two years of the date of the initial determination if the Commissioner finds good cause to reopen.  20 C.F.R. § 416.1489(a) provides that good cause exists when the Commissioner finds that new and material evidence is furnished or the evidence that was considered clearly shows on its face that an error was made.  Whether to reopen a prior decision is within the Commissioner's discretion.  Denying a request to reopen a determination is an administrative action "not subject to the administrative process. . . . and not subject to judicial review."  20 C.F.R. § 416.1403(a); *see also Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990).

However, "[w]hen a claimant presents evidence that mental incapacity prevented him or her from timely requesting review of an adverse determination . . ., and the claimant had no one legally responsible for prosecuting the claim (e.g., a parent of a claimant who is a minor, legal guardian, attorney, or other legal representative) at the time of the prior administrative action", the SSA is required to determine whether or not good cause exists for extending the time to request review.  SSR 91-5p, 1991 WL 208067, at *2; *see also Blair v. Apfel*, 229 F.3d 1294, 1296 (10th Cir. 2000). (unpublished).  If the claimant satisfies this criteria, "the time limits in the reopening regulations do not apply; so that, regardless of how much time has passed since the prior administrative action, the claimant can establish good cause for extending the deadline to request review of that action."  *Id.*  Indeed, if this criteria is satisfied, there

may be constitutional grounds to challenge the decision not to reopen.  *See Califano v. Sanders*, 430 U.S. 99, 109 (1977); *Blair*, 229 F.3d at 1295-96; *Young v. Bowen*, 858 F. 2d 951, 955 (4th Cir. 1988).

In the case at hand, Plaintiff presented evidence that he may be mentally retarded and that he was not represented in the prior hearings.  The ALJ has already been instructed on remand to reassess the issue of whether Plaintiff meets the Listing for Mental Retardation.  If he is found to be mentally retarded, the ALJ must also address whether to reopen the earlier decisions based on SSR 91-5p and the above case law.

III.    CONCLUSION

Based upon the foregoing, I find that the ALJ erred at steps two and in three in regard to Plaintiff's mental impairments, including the assessment of evidence regarding mental retardation.  I also find that the ALJ's RFC assessment is not supported by substantial evidence.  This case must be remanded to the Agency for further fact finding on these and the other issues discussed in this Order.  It is therefore

ORDERED that this case is **REVERSED AND REMANDED** to the Commissioner for further fact finding pursuant to sentence four in 42 U.S.C. § 405(g).

Dated September 20, 2011

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge